**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

| | |
|---|---|
| DARRY HENDERSON, | ) |
| | ) |
| Plaintiff, | ) |
| | )   Civil Action |
| v. | )   No. 17-12100-PBS |
| | ) |
| MASSACHUSETTS BAY TRANSPORTATION | ) |
| AUTHORITY, | ) |
| | ) |
| Defendant. | ) |

---

**MEMORANDUM AND ORDER**

June 17, 2019

Saris, C.J.

**INTRODUCTION**

Plaintiff Darry Henderson brings this action against the Massachusetts Bay Transportation Authority ("MBTA") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Henderson, a black man and long-time MBTA employee, claims that the MBTA denied him a promotion because of his race and retaliated against him for complaining about what he believed to be a supervisor's race-based comment by denying him an overtime opportunity.

After hearing, the Court **ALLOWS** the MBTA's motion for summary judgment (Docket No. 53).

1

## FACTUAL BACKGROUND

The following facts are undisputed except where otherwise stated.

## I.   The MBTA's Hiring Process

The MBTA follows a standard hiring procedure. Human resources ("HR") posts a listing for the open position that includes a number of "minimum entrance requirements" ("MERs"). HR reviews the applications to determine whom to interview. A candidate need not satisfy all of the MERs to receive an interview. For example, HR does not screen for MERs that are not readily quantifiable or apparent from an application and those for which the MBTA screens post-interview (e.g., background check, medical testing). Instead, HR focuses on the easily determinable MERs, such as educational and work history.

HR then assembles a selection committee to conduct the interviews. The committee consists of at least one representative from HR and one or more members of the department in which the individual to be hired will work. The committee asks the candidates a set of uniform questions during the interviews. Each committee member scores each answer the candidates give based on guidelines provided by HR. Committee members generally do not discuss the candidates and their answers before recording their scores. The MBTA hires the candidates who receive the top scores, unless they fail a

background check or medical screening. Before making a final
hiring decision, HR provides a summary of the process and the
resumes of the recommended candidates to the diversity
department for approval.

## II.   Henderson's Employment History with the MBTA

Henderson, a black male, began working at the MBTA in 1991
as a construction laborer. In 1995, he was promoted to laborer
foreperson. In this position, he leads a crew of two to four
laborers to identify and fix maintenance issues. From 2000 to
2005, he served as a temporary supervisor. Duties of a
supervisor include managing maintenance projects, responding to
emergencies, and maintaining records of repair activities.
Supervisors manage teams of around thirty workers across two or
three different trades.

When he served as a temporary supervisor in the early
2000s, Henderson unsuccessfully applied to be a permanent
supervisor. One of the two supervisors the MBTA hired instead
was Debra Gilcoine, who was promoted to the position of
superintendent after three or four years. Henderson resumed his
job as a laborer foreperson in 2005 because he had not been
permanently promoted. He never again expressed interest in being
a temporary supervisor, nor did the MBTA reoffer him the
position.

## III. __Job Posting for New Supervisors__

The MBTA posted an opening for two permanent supervisors of Building and Station Maintenance in November 2011. The MERs for the position included a high school diploma or GED, at least five years of work history in building and equipment maintenance, supervisory experience, and the ability to use certain software applications. Although the MBTA received some applications, it did not conduct interviews because of a temporary hiring freeze.

Before reopening the job posting the next summer, Steve Emde, then a staffing manager in HR, met with current employees in Charlestown to recruit internal applicants. Gilcoine and Henderson were present. At the end of the meeting, Gilcoine told Henderson she would be on the selection committee for the supervisor position. Henderson was concerned because Gilcoine was friends with a painter foreperson named Bernadette Higgins who was applying for the position. Higgins began working at the MBTA in March 1992 as a painter and was promoted to painter foreperson in 2000. Since 2011, she had worked as a temporary supervisor. She and Gilcoine became friends when she started as a painter: Gilcoine was her foreperson, and they were in the union together. Gilcoine did not encourage her to apply for the supervisor position and did not talk to her about her application.

4

Henderson met with Emde to express his concern that
Gilcoine's participation in the hiring process was unfair. Emde
notified his supervisor about Henderson's concern, and they
decided to remove Gilcoine from the selection committee. Emde
did not tell anyone else involved in the hiring process about
this issue.

HR reposted the job listing for the supervisor position on
September 5, 2012. Henderson and Higgins both submitted
applications. In her application, Higgins listed Gilcoine as a
reference. William Melchionda, an external candidate with two
decades of construction and building maintenance experience,
also applied. He left the computer skills section of his
application blank. His application listed Bill Perez, the head
of the MBTA's HR department, and Perez's brother as references.
Melchionda and Perez had worked together previously, and
Melchionda was friends with Perez's brother. Perez never spoke
to anyone involved in the hiring process about Melchionda, and
the selection committee did not discuss the fact that Perez was
listed as a reference. In total, the MBTA received 119
applications for the supervisor position.

HR reviewed the applications to determine whom to select
for interviews. HR screened for only four MERs: 1) a high school
diploma or GED, 2) five years of relevant work experience,
3) supervisory experience, and 4) (for internal candidates) a

satisfactory work record for the preceding two years. For reasons that are unclear in the record, HR did not screen for the ability to use the computer applications that had been listed as one of the MERs in the job posting. HR invited twenty-three candidates to interview, twenty of whom accepted.

On October 12, while HR was reviewing applications for the supervisor position, another laborer foreperson was assigned to "podium duty" instead of Henderson. Podium duty involves setting up the podium and speakers for speeches by government officials and MBTA executives. A crew assigned to podium duty often receives overtime, although sometimes the work is conducted during the regular workday. The union steward generally determines who receives overtime opportunities such as podium duty, but Gilcoine had some say as superintendent. Henderson had worked podium duty for five years before this reassignment, which was the first available podium duty in months. Henderson has not worked podium duty since this period but has had other overtime opportunities.

## IV.  **Interview Process**

The selection committee consisted of three white men: Emde from HR; John Martin, a supervisor in the electrical power department; and Andrew Baker, a director in the engineering and maintenance department. They interviewed the twenty candidates over six days between November 28 and December 18. Both Higgins

and Henderson interviewed on November 28. Melchionda interviewed
for the position on December 4. During his interview, Melchionda
explained that he used a computer daily, including at home, but
mostly to print documents and keep maintenance logs updated. He
reported his use of computers as "minimal." For each candidate,
the committee members recorded responses to the standard
questions, gave each response a score, and then tallied up the
total points.

When HR reviewed the scores, they realized Baker gave all
the candidates very low scores, save one. After discovering that
Baker's second-in-command had put in a good word for that
candidate, HR removed his scores from the calculations. The
removal of Baker's scores did not affect Henderson's ranking.

Higgins, who is white, received the highest scores of all
the candidates, with a 94 from Martin and a 93 from Emde. The
committee scored her highly because she had experience
supervising larger groups and served recently as a temporary
supervisor. Melchionda, who is also white, received the second
highest scores, with a 92 from both Martin and Emde. The
committee scored him highly because he had supervised sixty
employees, independently managed complex construction projects,
and had experience supervising a unionized workforce. Henderson
received the second-lowest score of the twenty candidates with a
61 and 56.

Before deciding whom to hire, HR contacted David Benson, one of Melchionda's references, who said, "He's been gone for a long time and was my foreman. He moved on to better/greener pastures. Got to go now." Dkt. No. 78 at 15.[1] Ultimately, because Higgins and Melchionda received the highest scores in the interview, the selection committee recommended hiring them in mid-January 2013. Higgins and Melchionda were notified that they received the position in mid-February. Henderson was informed he did not get the job on February 28. He has continued as a laborer foreman at the MBTA to this day. He is now supervised by Melchionda. After Melchionda started as a supervisor, Henderson had to teach him a bit about the MBTA, including how to get around the system, use MBTA-specific computer systems, navigate the chain of command, and follow MBTA safety procedures.

## V.   **Computer Incident with Gilcoine**

Separately from the hiring process, Henderson claims that Gilcoine yelled at him for filling out paperwork on a computer in the MBTA office in Charlestown on January 31, 2013. Although other employees regularly used the office, Gilcoine said to him, "Get out of the office, Darry. I don't want you in there." Dkt.

---

[1]   Henderson includes this quotation in his brief, but neither party submits the portion of Emde's deposition where he discusses the phone call with Benson. Because this conversation does not change the analysis under Title VII, the Court assumes that it took place.

No. 56-1 at 120:24-121:15. Gilcoine denies this encounter occurred. Gilcoine Dep. 50:4-7. Henderson claims that he discussed Gilcoine's outburst a week later with Satyen Patel, a deputy director in the department. Henderson mentioned that he thought Gilcoine yelled at him because of his race, and Patel said he would speak with her. Patel testified that he never spoke with Henderson about this incident.

## VI.  **Procedural History**

After filing an unsuccessful complaint with the MCAD, Henderson brought suit against the MBTA on October 26, 2017. He alleges racial discrimination in violation of Title VII, retaliation in violation of Title VII, and negligent infliction of emotional distress. On February 8, 2019, the MBTA moved for summary judgment on all three claims. Henderson concedes the MBTA is entitled to summary judgment on the negligent infliction claim but opposes summary judgment on the two Title VII claims.

**DISCUSSION**

## I.  **Standard of Review**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87

(1st Cir. 2018) (quoting <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23-24 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." <u>Doe v. Trs. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018). "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018).

The burden on a summary judgment motion first falls on the movant to identify "the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." <u>Irobe v. U.S. Dep't of Agric.</u>, 890 F.3d 371, 377 (1st Cir. 2018) (quoting <u>Borges ex rel. S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010)). If the movant meets this "modest threshold," the burden shifts to non-movant to "point to materials of evidentiary quality" to demonstrate that the trier of fact could reasonably resolve the issue in its favor. <u>Id.</u> The court must deny summary judgment if the non-movant "adduces competent evidence demonstrating the existence of a genuine dispute about a material fact." <u>Theriault v. Genesis HealthCare LLC</u>, 890 F.3d 342, 348 (1st Cir. 2018).

## II.  **Discrimination (Count I)**

### A.  **Legal Standard**

Under Title VII, an employer may not "refuse to hire . . .
any individual . . . because of such individual's race." 42
U.S.C. § 2000e-2(a)(1). Where, as here, the plaintiff relies on
circumstantial evidence to support a claim of discriminatory
hiring, courts apply the McDonnell Douglas burden-shifting
framework. Cruz v. Mattis, 861 F.3d 22, 25 (1st Cir. 2017).
Under this framework, the plaintiff must first establish a prima
facie case of discrimination, i.e., that "(1) he is a member of
a protected class; (2) he was qualified for the position to
which he applied; (3) he applied to that position and was not
hired; and (4) the position to which he applied was filled by a
person possessing similar or inferior qualifications." Id.
Establishing a prima facie case "raise[s] an inference of
intentional discrimination," which shifts "the burden to the
employer to articulate a legitimate, nondiscriminatory reason
for the challenged employment decision." Mancini v. City of
Providence, 909 F.3d 32, 39 (1st Cir. 2018) (quoting Rathbun v.
Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004)).

"If the employer articulates such a reason, then the burden
of production reverts to the plaintiff, who must offer evidence
tending to prove that the reason offered by the employer is a
pretext for discrimination." Cruz, 861 F.3d at 25. An employee

11

can demonstrate pretext "by exposing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason." Miceli v. JetBlue Airways Corp., 914 F.3d 73, 82 (1st Cir. 2019) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000)). To satisfy his burden on the final step of the McDonnell Douglas framework, the plaintiff must produce evidence that the employer's "explanation is pretextual and that discriminatory animus prompted" the hiring decision. Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 313 (1st Cir. 2016).

## B.   Analysis

Henderson alleges that the MBTA did not promote him to the supervisor position because of his race. There is no question he satisfies the first and third elements of the prima facie case: he is a member of a protected class because of his race, he applied for and did not receive the supervisor position, and two white applicants received the job instead.

The MBTA argues that Henderson was not qualified for the position and did not have similar qualifications to Higgins and Melchionda because he earned much lower scores than they did in identical interviews. The First Circuit has sometimes found that an applicant with lower scores in an interview than the hired candidate failed to make out a prima facie case where the interview demonstrated an objective lack of competence in key

12

job duties. See Goncalves v. Plymouth Cty. Sheriff's Dep't, 659
F.3d 101, 106-07 (1st Cir. 2011) (holding that the plaintiff
failed to establish a prima facie case where she received the
lowest interview and written exam scores and lacked critical
technical skills and work experience); Martinez-Burgos v.
Guayama Corp., 656 F.3d 7, 12-13 (1st Cir. 2011) (same for a
claim of pregnancy discrimination where the employer interviewed
candidates using a questionnaire to determine the top five
scorers under competence standards, the plaintiff did not rank
in the top five and demonstrated a lack of knowledge of good
manufacturing practices and safety rules, and the hired
individuals had better scores). Still, the burden of
establishing a prima facie case is "not onerous," Caraballo-
Caraballo v. Corr. Admin., 892 F.3d 53, 57 (1st Cir. 2018), and
HR deemed Henderson sufficiently qualified to receive an
interview based on the objective MERs for which it screened.

     Some of the questions the selection committee asked at the
interview involved objective criteria. For example, the
committee asked all the candidates, "Please tell us about your
experience managing large maintenance and/or construction
projects. Please tell us what your responsibilities were during
these projects." Dkt. No. 56-15 at 17. Here, Melchionda got an 8
(out of 10) and Henderson got a 4, which made sense because
Henderson provided fewer specifics. For another question dealing

with computer experience, though, the committee's notes reflect that Henderson had more computer experience than Melchionda (who described his computer skills as "minimal"), yet Henderson received three points lower. And unlike in Goncalves and Martinez-Burgos, many questions involved open-ended inquiries requiring the committee to subjectively evaluate the candidates' answers. For example, the first question asked, "Why did you apply for this position? What challenges do you think this position would offer you?" Dkt. No. 56-15 at 16. A review of the answers to this question does not reveal an objective basis for scoring Melchionda an 8 and Henderson a 5.

After examining Melchionda's, Higgins's, and Henderson's answers, the Court cannot say that Henderson's score was based on objective criteria that would demonstrate he was not qualified for the job or similarly qualified to the successful candidates. Much of the scoring appeared to involve a subjective evaluation, not an objective rating of technical skills or industry knowledge. Henderson's low score in the interview therefore does not defeat his prima facie case.

At the second step of the McDonnell Douglas framework, the MBTA contends it did not hire Henderson because of his poor interview performance. This nondiscriminatory justification satisfies the MBTA's burden of production. The burden therefore

reverts back to Henderson at the final step to offer evidence of pretext.

Henderson focuses much of his argument for pretext on the decision to interview Melchionda. Because Melchionda did not list any computer skills on his application, the MBTA could not have determined that he met the MERs for the position, one of which required the "ability to use Word, Excel, Database, Peoplesoft or Main Frame applications." Dkt. No. 56-15 at 14. In Henderson's view, by nevertheless selecting him for an interview, and then hiring him, the MBTA bent its hiring policy for a white man, raising an inference of discrimination.

According to Edme's testimony, however, HR only screened out candidates before the interview phase based on the educational and work history MERs. While the "ability" to use the computer applications was a requirement for ultimately being hired, the MBTA contends a candidate did not have to show this "ability" through his application or resume to receive an interview.

It is hard to understand why someone who left an answer blank on a minimum required job skill was given an interview, but the MBTA's decision to interview Melchionda does not, without more, raise a reasonable inference of racial discrimination as opposed to, say, cronyism. See Ahmed v. Johnson, 752 F.3d 490, 498 (1st Cir. 2014) (explaining that

15

undermining the employer's proffered justification is
insufficient by itself to survive summary judgment where it
shows only that the employer "resort[ed] to a pretext to conceal
an arguably inappropriate, albeit not unlawful, motivation, such
as to curry favor with a friend or family member"). Indeed,
Melchionda may have received an interview despite lacking the
required computer skills because he was otherwise qualified and
listed Bill Perez, the head of HR at the MBTA, and Perez's
brother as references (though there is no evidence the selection
committee expressly considered the references). See Barry v.
Moran, 661 F.3d 696, 708 (1st Cir. 2011) ("[A]n employment
decision motivated by cronyism, not discrimination, would be
lawful, though perhaps unsavory." (quotation omitted)).

Henderson also points to the MBTA's hiring of Melchionda
despite a lukewarm reference from David Benson. Benson's
reference, while not glowing, was not negative, and the MBTA
could have reasonably hired Melchionda based on his high
interview scores despite this lackluster job reference.

Henderson has not shown that he was plainly more qualified
than Higgins or Melchionda. See Rathbun, 361 F.3d at 74 ("[I]n
the absence of strong objective evidence (e.g., test scores),
proof of competing qualifications will seldom, in and of itself,
be sufficient to create a triable issue of pretext."). While
Melchionda had worse computer skills, the undisputed evidence is

that he had more experience supervising larger teams than
Henderson and interviewed better. An employer may properly rely
on interview performance in making promotion decisions. <u>See</u>
<u>Velazquez-Ortiz v. Vilsack</u>, 657 F.3d 64, 75-76 (1st Cir. 2011).
Even though the scoring of the answers appears subjective in
some areas, there is no evidence from which a reasonable jury
could find racial discrimination. Henderson complains that his
low scores indicate that the committee did not record his full
answers, but he provides no specifics as to what he contends the
committee missed and why the committee should have given him a
higher score.

Henderson also provides no evidence that the committee ever
discussed or considered his race. Henderson suspects Gilcoine
informed the committee that she preferred a white candidate, but
Gilcoine never spoke to the committee members about the
supervisor position and was not involved in the hiring process.
Henderson criticizes the all-white composition of the committee,
but this alone cannot create an inference of racial
discrimination. <u>See</u> <u>Rivas Rosado v. Radio Shack, Inc.</u>, 312 F.3d
532, 534 (1st Cir. 2002). Henderson's "subjective belief of
discrimination is not sufficient to withstand summary judgment."
<u>Tyree v. Foxx</u>, 835 F.3d 35, 42 (1st Cir. 2016).

Finally, Henderson relies on troubling evidence about the
MBTA's history of racial discrimination. He submits evidence

that white employees were promoted significantly more frequently than black employees from 1999 to 2008 and that no black employees were promoted for certain positions in many years. He also points to a letter from the Federal Transit Administration which stated that the Massachusetts Department of Transportation/MBTA received 750 Equal Employment Opportunity ("EEO") complaints based on race and gender discrimination in a three-year period before 2013.

"[S]tatistical evidence of a company's general hiring patterns" may be relevant "if it tends to prove the discriminatory intent of the decision makers involved." Ray v. Ropes & Gray LLP, 799 F.3d 99, 116 (1st Cir. 2015) (quotations omitted). Such evidence by itself, however, "rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision." Id. (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993)). While the evidence Henderson submits is troubling, the statistics about promotions end four years before the hiring decision at issue in this case, and the nature and resolution of the EEO complaints are unclear. Given the lack of information about promotions in Henderson's department, his statistical evidence does not show that Emde or Martin acted with discriminatory intent.

Accordingly, the MBTA is entitled to summary judgment on Count I.

## III. **Retaliation (Count II)**

### A.   **Legal Standard**

An employer may not retaliate against an employee for
reporting a violation of Title VII. Carlson, 899 F.3d at 43
(citing 42 U.S.C. § 2000e-3(a)). As with a claim of
discrimination, courts apply the McDonnell Douglas burden-
shifting scheme when the plaintiff relies on circumstantial
evidence of retaliation. Id. To establish a prima facie case,
the plaintiff must show that "(1) he engaged in protected
conduct under Title VII; (2) he experienced an adverse
employment action; and (3) a causal connection exists between
the protected conduct and the adverse employment action."
Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 13
(1st Cir. 2012). If the plaintiff establishes a prima facie case
of retaliation, "the burden shifts to the defendant to
articulate a legitimate, non-retaliatory explanation for its
actions." Planadeball v. Wyndham Vacation Resorts, Inc., 793
F.3d 169, 175 (1st Cir. 2015). Assuming the employer provides
such an explanation, "the burden shifts back to the plaintiff to
show that the defendant's explanation is a pretext for unlawful
retaliation." Id.

### B.   **Analysis**

Henderson claims Gilcoine retaliated against him by denying
him podium duty for his complaint to Patel that she yelled at

19

him for using a computer in the Charlestown office, which he
believes was based on his race. The parties dispute whether
Henderson's conversation with Patel happened. Even if it did,
Henderson testified that it occurred in February 2013, five
months <u>after</u> Gilcoine denied him podium duty in October 2012.
"Causation moves forward, not backwards, and no protected
conduct after an adverse employment action can serve as the
predicate for a retaliation claim." <u>Pearson v. MBTA</u>, 723 F.3d
36, 42 (1st Cir. 2013); <u>see also</u> <u>See</u> <u>Bonilla-Ramirez v. MVM,</u>
<u>Inc.</u>, 904 F.3d 88, 96 (1st Cir. 2018) (rejecting a retaliation
claim because the adverse employment action occurred before the
filing of the EEOC complaint).

Henderson seeks to avoid this temporal problem by arguing
that he continued to be denied podium duty after his complaint
to Patel. This theory also fails to satisfy the causation
element of the prima facie case. There is no evidence Gilcoine
or the union stewards responsible for assigning podium duty knew
about Henderson's complaint. <u>See</u> <u>Planadeball</u>, 793 F.3d at 177
(holding that the plaintiff failed to make a prima facie showing
of causation because she presented no evidence that the
individual who alleged took the adverse action against her knew
about her complaints). Nor can Henderson rely on temporal
proximity to show causation because he provides no specifics on

when he was denied podium duty after October 2012. The MBTA is therefore entitled to summary judgment on Count II.

### ORDER

Accordingly, the MBTA's motion for summary judgment (Docket No. 53) is **ALLOWED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge